IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL ROY HOLLOWAY )
)
v. ) No. 3:12-1111
) Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 15). Plaintiff has further filed a reply in support of his motion. (Docket Entry No. 18) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I. Introduction

Plaintiff filed his application for disability insurance benefits on December 29,

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

2008, alleging a disability onset date of October 16, 2008, due to hypertensive cerebrovascular disease, stroke, and "[multiple sclerosis] misdiagnosed and treated." (Tr. 93-94, 115) Plaintiff's claim was denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her claim by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on March 25, 2011, when plaintiff appeared with counsel and gave testimony. (Tr. 26-41) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until April 8, 2011, when he issued a written decision finding plaintiff not disabled. (Tr. 9-21) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since October 16, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*), but received unemployment benefits (Exhs. 2D-5D).

3. The claimant has the following severe impairments: arthritis; coronary artery disease and ischemic cardiomyopathy status post stent placement; stenosis of left superficial femoral artery; peripheral vascular disease; hypertension; and history of myocardial infarction and cerebrovascular accident (20 CFR 44.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that is limited to occasional lifting of twenty pounds; frequent lifting of ten pounds; sitting, standing, and walking each for six hours in an eight-hour workday; engaging in postural activities, except for no climbing of ladders; and avoiding concentrated exposure to extreme temperatures and hazards.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on February 6, 1957 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 16, 2008, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-15, 19-21)

On September 13, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from defendant's brief, Docket Entry No.

15 at 2-11:

> In 2003, plaintiff began experiencing cardiovascular-related symptoms of dizziness and blurry vision (Tr. 194). It was unclear whether he experienced a stroke or was suffering from multiple sclerosis (id.). After three days in the hospital, plaintiff's symptoms "gradually improved" (id.). Based on abnormalities seen on an MRI scan, plaintiff was treated with avonex for multiple sclerosis (id.). Plaintiff continued treatment on avonex for approximately four to five years without any problems (id.). Plaintiff also was treated for essential hypertension with fairly good control (id.).
>
> In July 2008, plaintiff sought treatment at Vanderbilt University Medical Center for a single episode of left-sided ataxia, weakness, and dizziness that resolved (Tr. 194-95). Following diagnostic testing in September 2008 to determine whether plaintiff's symptoms were ischemic events or demyelinating events, it was confirmed that plaintiff had hypertensive cerebrovascular disease, not multiple sclerosis (id.). Plaintiff was instructed to discontinue avonex (Tr. 195).
>
> On January 6, 2009, plaintiff visited Nashville General Hospital, Department of Internal Medicine, seeking a primary care physician and refills of his medications (Tr. 235). Plaintiff reported he had not seen a doctor since he was laid off from his job (id.). His medical history included hypertension, stroke, hypercholesterolemia, and hypothyroidism (id.). Plaintiff complained of lower back pain that intensified when moving or lifting (id.). Plaintiff's social history included smoking about ten cigarettes a day and drinking one or two beers a day (id.).
>
> Plaintiff also admitted to marijuana and cocaine use in the past (id.). In an Intake Form on the same date, plaintiff reported he had no pain and no difficulty walking

4

(238).

On January 20, 2009, plaintiff was admitted to Acute Medicine at Nashville General Hospital for a cardiovascular work-up (Tr. 241). Plaintiff reported chest pain, shortness of breath, and nausea for two weeks (Tr. 243). Plaintiff reported he smoked one half a pack of cigarettes and used marijuana three weeks earlier (Tr. 245). Plaintiff also reported he had not taken his hypertension medications for approximately four to six weeks (id.). Plaintiff reported he was in the process of seeking disability benefits (Tr. 252).

Testing for cardiac enzymes and EKG test results were negative (Tr. 243). A chest x-ray showed no evidence of acute cardiopulmonary disease (Tr. 264). Following testing and evaluation, acute coronary syndrome was ruled out (Tr. 243). Plaintiff was assessed with possible gastroesophageal reflux disease (id.).

On January 27, 2009, plaintiff underwent a stress test and myocardial perfusion testing (Tr. 265-66). Plaintiff's left ventricular myocardial perfusion testing showed one-vessel disease from lateral wall ischemia (Tr. 266). A follow-up visit on February 24, 2009, showed plaintiff's heart had an ejection fraction of fifty-five to sixty percent, grade-two diastolic dysfunction, mild left ventricular concentric hypertrophy, and a pseudonormal filling pattern (Tr. 285). However, the lateral defect/ischemia was reversible (Tr. 287).

Plaintiff attended a follow-up visit to Nashville General Hospital on March 10, 2009 (Tr. 288). Plaintiff complained of chest pain with a 2/10 intensity (Tr. 288-89). Plaintiff's social history included playing golf (Tr. 288). Plaintiff reported he quit smoking one month earlier (id.). Plaintiff was diagnosed with coronary artery disease, angina, and claudication (id.). Plaintiff was referred for diagnostic cardiac catheterization (id.).

On March 13, 2009, plaintiff underwent a cardiac catheterization, coronary

5

angiography, right femoral angiography, and single-vessel coronary stent placement (Tr. 293-304). The results of these procedures showed plaintiff had normal left ventricular function, mild elevation of left ventricular end-diastolic pressure, mild hypertension, and mild diffuse coronary disease with a critical lesion in the first diagonal (Tr. 308-09). Plaintiff received successful bare metal stenting of the origin of the diagonal (Tr. 309). Plaintiff was discharged one day after surgery with prescriptions for plavix, carvedilol, aspirin, doxazosin, ranitidine, simvastatin, nicardipine, lisinopril, and levothyroxine (Tr. 294). Plaintiff was instructed to "maintain a cardiac diet with a 2-gram sodium low-fat cholesterol diet" (Tr. 294). Plaintiff also was instructed to resume activity one day after being discharged (id.).

During a follow-up visit in April 2009, plaintiff was doing well with no further episodes of chest pain, shortness of breath (Tr. 316), or other pain symptoms (Tr. 317). Plaintiff continued to deny current cigarette use (id.). In June 2009, plaintiff reported no new cardiac complications or general medical complaints (Tr. 318). The next treatment reports of record are dated more than four months later (Tr. 443-64).

Plaintiff returned to Nashville General Hospital on October 27, 2009, with complaints of chest pain for one month (Tr. 445). Plaintiff reported he used to be a heavy smoker and alcohol drinker, but quit smoking and drinking after his catherization in March 2009 (Tr. 452). Plaintiff also reported quitting illicit drugs around that time (id.).

A nuclear stress test showed significant anterior ischemia and a potential inferior infarct (Tr. 449). Plaintiff underwent left heart catheterization, coronary and right femoral angiographies, and stent placement (Tr. 449-50). Plaintiff received a drug-eluting stent based on plaintiff's claim that he was compliant with his medication (Tr. 463). Plaintiff tolerated the procedures well without complications (Tr. 450). Upon discharge on November

6

1, 2009, plaintiff was advised to continue a low-fat, cardiac, 2-gram salt diet; engage in bed rest and minimal activity; and follow-up with Dr. Akamah, Cardiology, and Endocrinology in one week (id.).

On November 12, 2009, plaintiff attended a follow-up at Nashville General Hospital (Tr. 437). Plaintiff reported he had reduced his smoking to one half a pack a day (id.). Plaintiff also reported chest pain and angina with one flight of stairs and shortness of breath with exercise (id.).

The next day, plaintiff underwent an arterial duplex doppler ultrasound, which showed a localized partial obstructive change of the mid to right superficial femoral artery of greater than seventy percent, but no significant obstructive changes of the left lower extremity (Tr. 436). Plaintiff was diagnosed with peripheral vascular disease (Tr. 435).

On November 20, 2009, plaintiff was admitted to Nashville General Hospital for an elective left heart catherization with stent (Tr. 427-34). Plaintiff reported he "quit smoking earlier this year and has also quit using cocaine and heroin" (429). Plaintiff was discharged one day after the procedure, in stable condition, without any chest pain (Tr. 430).

The next treatment report of record is dated approximately four months later, on March 13, 2010 (Tr. 422-26). Plaintiff returned to the Emergency Department of Nashville General Hospital with complaints of left shoulder pain (Tr. 422). The onset of pain was approximately two weeks earlier (Tr. 423). Plaintiff's symptoms did "not suggest a primary cardiac etiology,… [n]ot related to trouble breathing, diaphoresis, or chest pain" (id.). Plaintiff stated he had similar symptoms of joint pain in the past that "seem to wax and wane" (id.). An examination of plaintiff's left shoulder revealed he had mild to moderate pain with movement and moderate tenderness to palpation (Tr. 424). "The overall exam

7

surrounding the left shoulder [was] consistent with a mild to moderate sprain/strain. The rest of the shoulder exam is normal. No contractures or significant decrease in [range of motion]. The distal neurovascular exam is intact. Strength is appropriate for patient's build" (id.).

Plaintiff's next treatment report was approximately one month later, on April 16, 2010 (Tr. 416). Plaintiff reported that the left shoulder pain began after "he extended his hand to break his fall in March" (id.). Plaintiff reported lower back pain for three weeks and continued left shoulder pain despite receiving a cortisone shot in the Emergency Department (id.). Plaintiff also reported he had smoked one half a pack of cigarettes for the past 36 years (id.). On the Intake Form, plaintiff reported pain of 3/10 and no difficulty walking (Tr. 419). An x-ray of plaintiff's shoulder on April 16, 2010, showed only moderate acromioclavicular degenerative changes, without any evidence of an acute fracture, dislocation, or injury to the soft tissues (Tr. 421).

The next day, plaintiff returned to the Emergency Department at Nashville General Hospital on account of near syncope (Tr. 404). "Patient claims he was getting ready to play golf this morning when he became really dizzy and was almost blacking out.... He subsequently had vomiting... that contained mostly egg and bacon which he had eaten on the morning of presentation" (id.). Despite a history of coronary artery disease status post PCI, history of hypertension on multiple blood pressure medications, hypothyroidism, hyperlipidemia, and benign prostatic hypertrophy (BPH), plaintiff reported he "had not been compliant with his medications in the past six months" (Tr. 402) (emphasis added). Plaintiff also admitted to smoking marijuana the night before (Tr. 405). Plaintiff stated he was "currently awaiting disability" (id.).

8

When plaintiff was at the hospital the day before, he was prescribed a new medication for BPH (Tr. 402). Plaintiff decided to take the new BPH medication along with all of his other prescribed medications all at once, resulting in hypotension with near syncope (id.). Nevertheless, a physical exam revealed that plaintiff "denied any chest pain, weakness on any part of the body, ... [and] no focal deficits. He was alert and oriented x3. Cardiac enzymes were negative x3, and EKG did not show any evidence of ischemia" (id.). Plaintiff also had 5/5 power in all muscle groups (Tr. 405). An x-ray of plaintiff's heart was within normal limits with no acute cardiopulmonary findings (Tr. 415). Following stabilization and counseling on medication compliance, plaintiff was discharged three days after being admitted (Tr. 403).

Plaintiff returned to Nashville General Hospital on May 18, 2010, for a follow-up related to his shoulder pain (Tr. 398). Plaintiff continued to complain of left shoulder pain (id.).

Approximately one month later, on June 15, 2010, plaintiff returned to Nashville General Hospital regarding new onset of calf muscle pain (Tr. 392). Plaintiff also reported "his GERD has worsened and would now like to try medication" (id.). Plaintiff reported "no other medical complaints" (Tr. 394). During a one-week follow-up, plaintiff continued to report muscle cramps (Tr. 387). Plaintiff, however, also reported he rarely or never had pain (Tr. 390).

In July 2010, plaintiff complained of burning in the stomach, pain when urinating, and pain after a bowel movement (Tr. 378, 383). Plaintiff's hypertension was well controlled (Tr. 378).

In August 2010, plaintiff's hypertension, coronary artery disease, and

peripheral vascular disease were assessed as stable (Tr. 376). Plaintiff had no complaints of chest pain, shortness of breath, or nausea/vomiting (Tr. 374). Plaintiff reported no pain and no difficulty walking (Tr. 377).

On September 10, 2010, plaintiff reported that since he underwent stent placement in November 2009, "he had done well, but over the past 7 to 10 days, he ha[d] noticed the recurrence of the same type of burning chest discomfort that occurred prior to his heart attack and prior to his admission in 10/2009" (Tr. 371). Plaintiff reported "[i]mportantly also, he has been out of lisinopril/hydrochlorothiazide for 1 week and has not taken this medication… [and] he has not taken his statin drug however for some time" (id.) (emphasis added).

On October 12, 2010, plaintiff underwent an exercise thallium imaging study due to recurrent angina (Tr. 369-70). The test showed a normal stress response, but abnormal left ventricular myocardial perfusion consistent with one- or two-vessel disease and scan significance indicative of an intermediate risk for hard cardiac events (Tr. 370).

On October 27, 2010, plaintiff underwent a left heart catheterization and coronary angiography of the right femoral artery (Tr. 352-53). These procedures showed normal systolic blood pressure with moderately elevated left ventricular end-diastolic pressure; severe two-vessel artery disease; and normal systolic function with a left ventricular ejection fraction estimated at fifty-five to sixty percent with no mitral valve regurgitation (id.).

On November 3, 2010, plaintiff underwent elective stenting of his right coronary artery and diagnostic angiography for peripheral vascular disease (Tr. 350-53). The procedures showed that both the superficial arteries were diseased, but that the right was

10

completely occluded before the adductor canal (id.). There was also evidence of mild-to-moderate disease in the left superficial femoral artery and severe disease in the right infrapopliteal vessels (id.). Plaintiff was discharged in stable condition (Tr. 344). Plaintiff was instructed to follow a 2-grams sodium, low fat, and low cholesterol diet (id.). Plaintiff also was instructed not to lift more than five pounds and to minimize walking around or exercise that involved excessive abduction or raising of the left lower extremity (id.).

During a follow-up visit on November 22, 2010, plaintiff complained of shoulder and bilateral feet pain (Tr. 341). Plaintiff reported the pain was 5/10 (id.). Plaintiff underwent another arterial duplex doppler ultrasound of the lower extremities due to continued complaints of bilateral foot pain (Tr. 335). The results were an elevated peak systolic velocity at the level of the mid aspect of the superficial right femoral artery suggestive of an area of stenosis of greater than seventy percent, and no significant obstructive changes of the arteries of the left lower extremity (id.).

Plaintiff returned to Joseph Akamah, M.D., at Nashville General Hospital one week later complaining of right leg pain with exercise, but no chest pain (Tr. 336). Plaintiff was instructed to perform daily exercise for his medical conditions of peripheral artery disease and coronary artery disease (id.). Dr. Akamah stated that he would prescribe a percutaneous transluminal angioplasty if plaintiff continued to have problems with claudication [(leg pain with exercise due to reduced blood flow)] in his right lower extremity (Tr. 332, 336). Despite plaintiff's complaints of aching in the legs and burning in the feet, both plaintiff's pedal pulses were palpable, an examination of plaintiff's extremities was unremarkable, and a neurological examination also was unremarkable (Tr. 332). At plaintiff's final visit to Nashville General Hospital, plaintiff denied chest pain (id.); his hypertension

11

was assessed as controlled (Tr. 333). Plaintiff's peripheral vascular disease was assessed as "currently not critical enough for intervention" (id.).

In addition to the treatment reports from Nashville General Hospital, the record includes an evaluation by consultative examiner Bruce A. Davis, M.D., dated April 22, 2009 (Tr. 206-09). Plaintiff reported his medical history included hypertension, hyperlipidemia, chest pain, shortness of breath, hypertensive cerebrovascular disease, poor short term memory, eye muscle weakness, left arm and leg weakness, unsteadiness, back pain, leg cramps, and leg pain (Tr. 206). Plaintiff reported smoking up to one pack a day for 36 years until he stopped smoking earlier that year, and occasional alcohol consumption (Tr. 207).

The musculoskeletal exam showed plaintiff had full range of motion in the neck, upper extremities, back, and lower extremities; reduced left grip to 4/5; no atrophy; no edema; and normal peripheral pulses, venous circulation, and gait maneuvers (Tr. 207-08). Dr. Davis opined that plaintiff's medical conditions were chronic and required "regular medical maintenance care with continued cigarette cessation" (Tr. 208). Dr. Davis opined that despite plaintiff's chronic physical impairments, plaintiff was able to lift twenty pounds occasionally and ten pounds frequently; stand/walk six hours in an eight-hour workday; and sit eight hours in an eight-hour workday (id.). Plaintiff also had other physical/environmental limitations related to limited heat/humidity, climbing/heights, forceful grip, and restroom access (id.).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found

> to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

<u>Cruse v. Comm'r of Soc. Sec.</u>, 502 F.3d 532, 539 (6th Cir. 2007)(<u>citing</u>, <u>e.g.</u>, <u>Combs v. Comm'r of Soc. Sec.</u>, 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

      The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. <u>See Wright v. Massanari</u>, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u>; <u>see also Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. <u>See Wright</u>, 321 F.3d at 616 (<u>quoting</u> Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in failing to give proper weight to the opinions of his treating physicians, Drs. Carew and Akamah. However, neither of these physicians rendered opinions as to plaintiff's work-related abilities, nor did they opine as to any particular restrictions that were based on plaintiff's course of treatment with them and expected to endure. Rather, the "opinions" which plaintiff contends were deserving of deference here are the restrictions contained in the discharge summaries following plaintiff's hospitalizations in 2009 and 2010 for left heart catheterization and placement of stents. Specifically, plaintiff argues that "[u]pon discharge on November 1, 2009, Dr. Carew restricted the Plaintiff to bed-rest with minimal activity, and recommended follow-up with Dr. Akamah, Plaintiff's treating cardiologist, in one week. Tr. 450." (Docket Entry No. 12-1 at 10) One year later, "[u]pon being discharged on November 4, 2010, Dr. Akamah specifically restricted the Plaintiff from lifting any weight more than five (5) pounds. Tr. 344. Dr. Akamah also stated that Plaintiff was to minimize walking around or any exercise that would involve excessive abduction or raising of the left leg. Tr. 344." Id. While plaintiff argues that these restrictions should reasonably be deemed to be permanent in the

15

absence of any indication to the contrary, the undersigned finds this argument to be specious. While they may not have been explicitly recognized as temporary, these restrictions were given in a "discharge summary," alongside such other provisions as plaintiff's condition on discharge and instructions on post-discharge wound care, diet, and followup appointments. (Tr. 344, 450) Accordingly, the undersigned finds that, in the absence of any indication that these were intended to be enduring restrictions, the ALJ was fully justified in not analyzing them as treating physician opinions. See Lawrence v. Colvin, 2014 WL 3512603, at *8 (D. Ore. July 10, 2014) ("The Court finds the ALJ reasonably determined that plaintiff's post-surgical limitations were intended to be temporary, such that they did not need to be incorporated into the RFC. Discharge instructions are typically for a fixed duration; by definition, they relate only to the immediate post-procedural period.").[2]

Plaintiff next argues that the ALJ erred in failing to conduct a function-by-function analysis as part of his RFC determination, as required by SSR 96-8p. The Sixth Circuit has examined this requirement, finding as follows:

> Although SSR 96–8p requires a "function-by-function evaluation" to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged. *See Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00-1995 (3d Cir. Dec. 19, 2000). [Additional citations omitted.]
>
> In *Bencivengo,* the Third Circuit stated, "Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a

---

[2]In Lawrence, as here, the discharge note also included wound care instructions, which the court cited as obvious evidence that such discharge notes only have near-term relevance. Also as here, the court in Lawrence noted that the claimant's hearing testimony revealed her ability to lift more than the five pounds she was restricted to in the wake of her surgery. Here, plaintiff testified at his hearing that he could lift and carry 15 pounds comfortably. (Tr. 34)

16

> detailed statement in writing." *Bencivengo,* slip op. at 4. The Third Circuit distinguished between what an ALJ must consider and what an ALJ must discuss in a written opinion. The ALJ need not decide or discuss uncontested issues, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Bencivengo,* slip op. at 5.

Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547-48 (6th Cir. Mar. 4, 2002).

In the instant case, plaintiff argues that the record supports limitations in his ability to engage in postural activities, as well as his ability to push and pull with his upper and lower extremities, all of which required the function-by-function evaluation missing here in order to provide substantial evidentiary support for the RFC determination, which is otherwise silent as to these abilities. However, plaintiff concedes that the ALJ appropriately accounted for a limitation to only occasional postural activities when questioning the vocational expert (Tr. 35), despite having omitted such limitation from his RFC finding. Accordingly, the failure to include such limitation as part of the RFC finding is rendered harmless. Furthermore, while plaintiff argues that his diagnosed degenerative joint disease of the left shoulder and peripheral vascular disease with intermittent claudication "would be expected" to cause limitations in pushing and/or pulling with his left arm and his legs, and that those functions should have been explicitly addressed in the determination of his RFC (Docket Entry No. 18 at 4), the ALJ specifically noted the lack of ongoing treatment for his shoulder problem (Tr. 18), as well as the fact that his RFC finding, based on Dr. Davis's assessment, accounted for the claudication resulting from plaintiff's peripheral vascular disease, "as the claimant was having problems with claudication at the time of his consultative examination [by Dr. Davis]." (Tr. 19) Therefore, the impact of these

17

impairments upon plaintiff's functional ability was duly considered.

Finally, with respect to this issue of the lack of a function-by-function analysis, plaintiff contends that the ALJ failed to address the assessment of nonexamining consultant Dr. Settle that plaintiff should avoid all exposure to environmental hazards, versus avoiding only concentrated exposure to such hazards, while also failing to address Dr. Davis's opinion that plaintiff had reduced grip strength in his left hand. However, the ALJ considered the assessments of both nonexamining consultants who opined on this record, giving significant weight to "Dr. Warner's opinion that the claimant should avoid concentrated exposure to hazards and to Dr. Settle's opinion that the claimant should avoid concentrated exposure to extreme cold and heat," and so reconciling these opinions to the findings of Dr. Davis. (Tr. 19) This finding contains sufficient explanation for the ALJ's considered rejection of Dr. Settle's assessed restriction against all exposure to hazards. Moreover, in discussing Dr. Davis's opinion, the ALJ noted the lack of a diagnosis related to plaintiff's grip strength as well as the lack of treatment for arthritis, and thus gave significant weight to the opinion "inasmuch as it is consistent with the claimant's residual functional capacity." (Tr. 19) Further discussion of these assessments as part of a more detailed function-by-function analysis was unwarranted here.

With regard to plaintiff's final two arguments -- that the ALJ erred in adopting the opinion of Dr. Davis and in failing to find plaintiff's left shoulder condition to be a severe impairment -- the undersigned finds no error. There is no error in failing to find plaintiff's shoulder condition severe, because that impairment was considered at subsequent steps of the sequential evaluation process. See, e.g., Maziarz v. Sec'y of Health & Human Servs., 837

18

F.2d 240, 244 (6th Cir. 1987). As the ALJ emphasized, despite plaintiff's suffering from a number of impairments which are "severe," there are no opinions as to his work-related abilities on this record from any treating sources. (Tr. 19) With the opinion evidence thus limited, the ALJ properly worked from the opinions of Dr. Davis and the nonexamining consultants, considered all of the medical evidence including the evidence of moderate degenerative changes in plaintiff's left shoulder (Tr. 18) as well as the testimony of the plaintiff, and determined that he was not disabled but was limited to a range of light work. The decision of the ALJ is supported by substantial evidence on the record as a whole, and should therefore be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 30th day of June, 2015.

                                             s/ John S. Bryant
                                             JOHN S. BRYANT
                                             UNITED STATES MAGISTRATE JUDGE